UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LIDIA D. MAYOR                                    :

               Plaintiff,                :               15 Civ. 0344 (AJP)

         -against-                   :               **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of        :
Social Security,
                                                  :
           Defendant.
                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Lidia Mayor, represented by the law firm of Binder & Binder, brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying her Social Security Disability Insurance Benefits ("DIB").  (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 12: Mayor  Notice of Mot.; Dkt. No. 14: Comm'r Notice of Mot.)  The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 8.)

        For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is <u>GRANTED</u> and Mayor's motion (Dkt. No.12) is <u>DENIED</u>.

<u>FACTS</u>

<u>**Procedural History**</u>

        Mayor applied for DIB on January 25, 2012, alleging disability since December 23, 2011.  (Dkt. No. 10: Administrative Record ("R.") 165-73.)  After the Commissioner denied

Mayor's application on initial review (R. 120-25), Mayor requested a hearing (R. 130-31).  On May 2, 2013, Mayor appeared before ALJ Mark Hecht.  (R. 109-17.)  On May 20, 2013, ALJ Hecht denied Mayor's application, finding that Mayor could perform light work.  (R. 63-73.)  On November 28, 2014, the Appeals Council denied Mayor's request for review.  (R. 1-9.)

The period at issue is from December 23, 2011, when Mayor alleged she first became disabled, through May 20, 2013, the date of ALJ Hecht's opinion.

**Non-Medical Evidence**

Mayor, born in 1969, was forty-two years old at the time of her alleged onset date. (R. 112, 167.)  Mayor was born in the Dominican Republic and came to the United States in 1995. (R. 112.)  Mayor attended school through the fifth grade and cannot read or write in English.  (R. 113-14.)

Mayor lives in an apartment with her family.  (R. 212.)  Mayor reported that she does "not feel like doing anything, [is] highly depress[ed] [and does] not have energy."  (R. 213.)  Mayor stated that she does not "have motivation to get dress[ed], bathe, or take care of [her] hair."  (Id.) Mayor has "no problem" feeding herself or using the toilet.  (R. 214.)  Mayor reported that she "buy[s] [her] food outside," she does "not prepare meals at all."  (Id.)  Mayor goes shopping in stores for cereal and milk.  (R. 216.)  Mayor stated that she does not do house or yard work because she does not have the energy, and does not have a hobby.  (R. 215-16.)  Mayor has no friends.  (R. 217.) Mayor can travel alone by bus but not by train.  (R. 113.)  Mayor does not need aids to walk.  (R. 219.)  Mayor stated that she used to go to church regularly but now does not.  (R. 217.)  Mayor has problems getting along with people in authority because she "always wants [to] be [the] leader," and reports difficulty with memory and paying attention.  (R. 219-20.)  Mayor feels pain in her head and back, for which she takes Motrin.  (R. 220-21.)  Wearing glasses also relieves the pain.  (R. 222.)

Mayor worked as a home health aid from 1995-2011.  (R. 114.)  Mayor communicated with clients in English and Spanish.  (Id.)  Mayor worked twelve hours per day, seven days a week.  (R. 196.)  At her job, she walked for half an hour, stood for eleven hours, sat for one hour, handled objects and reached for twelve hours, and handled small objects for four hours.  (R. 197.)  Mayor had to "lift patients in and out of bed or out of the bath tub."  (Id.)  Mayor lifted 100 pounds or more.  (Id.)  Mayor stopped working on December 23, 2011 because of her conditions, especially that she felt confused and depressed.  (R. 114, 195.)  Mayor reported that depression, headaches, total back pain and forgetfulness limit her ability to work.  (R. 195.)  Mayor reported that she started feeling depressed following gynecological surgery.  (R. 114-15.)  Mayor feels depressed on and off and takes medication for her depression daily.  (R. 114, 116.)  Mayor stated that her back pain was caused by having to pick up her last patient from bed.  (R. 115.)  Mayor testified that she was going to start physical therapy for her back pain.  (Id.)  In response to whether her inability to work was physical or mental, Mayor claimed that she cannot work as a home health aid because she physically cannot perform the job.  (R. 116.)  She testified that she might be able to do a lighter job.  (Id.)

**Medical Evidence Before ALJ Hecht**

**Treatment Records From April 2010 To September 2011**

On April 20, 2010, Dr. Ramon Tallaj saw Mayor for complaints of depression. (R. 342-46.)  Mayor reported that she could engage in her usual activities and had good exercise tolerance, with no fatigue.  (R. 342.)  Mayor told Dr. Tallaj that she had no back or other musculoskeletal pain, and had good memory, speech and mood, with no nervousness, tension, suicidal ideation, unusual perceptions, obsessions or compulsions.  (R. 342-43.)  On examination, Dr. Tallaj found Mayor to be normal in all areas.  (R. 343.)  Dr. Tallaj observed that Mayor's mood

and affect were appropriate, she was in no acute distress, and she was pleasant. (Id.) Nonetheless, Dr. Tallaj diagnosed major depression, which he labeled severe based on Mayor's Patient Health Questionnaire-9 ("PHQ-9") score of twenty-one. (R. 342-43.)

Dr. Tallaj examined Mayor eight more times from May 2010 through September 2011. (See R. 347-66.) Examination findings and diagnoses were substantially similar to Mayor's April 2010 results, except that Mayor also complained of fatigue, tenseness and body aches, and Dr. Tallaj observed that Mayor was anxious, depressed and crying. (Id.) Although Dr. Tallaj prescribed Lexapro, Mayor often refused to take it. (R. 348-50, 353, 356, 358.) During a June 2010 visit, Dr. Tallaj advised Mayor to see a psychiatrist. (R. 350.)

### Treatment Records From December 23, 2011 Through May 20, 2013

On January 12, 2012, Mayor saw LMSW Rebecca Rio of Morrisania Diagnostic & Treatment Center. (R. 286-88.) Rio diagnosed Mayor with depressive disorder. (R. 287-88.) Mayor had a GAF score of 60. (R. 288.)[1/] Mayor had follow-up appointments with Rio on January 26 and February 7, 2012. (R. 294, 297.) Rio reported that Mayor was "very angry" about her unemployment. (R. 294, 297.) Mayor was well groomed, wore heavy make-up and was appropriately dressed. (R. 294, 297.) Mayor "appear[ed] irritable, affect is constricted, mood is depressed." (R. 294, 297.) Rio noted no high risk factors. (R. 294, 297.)

On January 24, 2012 Mayor saw Dr. Swarupa Gaddipati at Morrisania. (R. 283.) Mayor's physical exam was unremarkable; she was alert, active, in no acute distress and oriented.

---

[1/]    A GAF score between forty-one and fifty indicates serious symptoms or any serious impairment in social, occupational or school functioning. Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994). A GAF score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. Id. A GAF of sixty-one to seventy represents some mild symptoms or some difficulty in social, occupational or school functioning. Id.

(Id.)  Mayor reported anhedonia and depressed mood.  (R. 284.)  Dr. Gaddipati's primary diagnosis was "[m]ajor depressive disorder, recurrent episode, severe, without mention of psychotic behavior." (Id.)  Mayor scored twenty-four on the PHQ-9, suggesting severe depression.  (R. 285.)

On February 2, 2012, Mayor saw psychiatrist Dr. Henry Rochel at Morrisania.  (R. 290-92.)  Mayor reported feeling depressed following her surgery and her depression worsened after she lost her job as a home assistant.  (R. 291.)  Mayor reported crying, difficulty sleeping and concentrating, low energy, memory deficits and feelings of helplessness.  (Id.)  Mayor's examination results were essentially normal; Mayor had a cooperative attitude with normal eye contact, speech and gait, and she had no suicidal or homicidal ideation or perceptual disorders and no-risk of self-harm or violence.  (R. 290-91.)  Dr. Rochel found that Mayor related well and was alert and oriented to person, place, time and situation.  (R. 290.)  Mayor was coherent and logical, with a full, normal, stable and appropriate affect, although her dominant emotion was depression.  (Id.)  Mayor had no gross deficits in registration, attention and calculation, recall, language, visual-motor integrity, insight or judgment.  (Id.)  Mayor had a kempt appearance, her judgment was unimpaired, and Dr. Rochel found her to have average intelligence.  (Id.)   Mayor had a GAF score of fifty.  (R. 292.)  Dr. Rochel diagnosed severe depressive disorder, prescribed Zoloft, and recommended psychotherapy.  (R. 291-92.)

On April 2, 2013, Mayor had an MRI of her lumbar spine.  (R. 404.)  The MRI revealed L3-L4 disc bulge flattening the thecal sac, "L4-L5 disc bulge with right foraminal[2]

---

[2]     A foramen is a "natural opening or passage, especially one into or through a bone." Dorland's Illustrated Medical Dictionary at 729 (32d ed. 2012).

annular[3] tear, flattening the thecal sac and resulting in bilateral neural foramen stenosis[4] with posterior facet arthropathy" and L5-S1 disc results in bilateral neural foramen stenosis with posterior facet arthropathy.  (R. 404.)

## Treating And Consultative Medical Opinions

On February 7, 2012, Dr. Tallaj completed a report for the New York State Office of Temporary and Disability Assistance Division of Disability Determinations.  (R. 316-25.)  Dr. Tallaj reported that he first saw Mayor on March 18, 2010 and last examined Mayor on September 28, 2011, and diagnosed Mayor with depression.  (R. 316.)  Mayor exhibited poor mood and affect and poor hygiene, which Dr. Tallaj stated suggests a significant psychiatric disorder.  (R. 317.) Symptoms on April 20, 2010 included crying, fatigue, poor energy, body aches, increased appetite and poor memory.  (Id.)

In his mental status findings, Dr. Tallaj noted that Mayor had poor appearance, hygiene, affect and mood.  (R. 320.)  Mayor had a "very anxious and angry attitude."  (Id.)  Dr. Tallaj reported that Mayor usually stays in bed, had poor memory, was easily confused and exhibited poor judgment.  (R. 321.)  Dr. Tallaj opined that Mayor could occasionally lift ten pounds, stand and walk two hours a day, and had no limitation on sitting.  (R. 322.)  Dr. Tallaj opined that Mayor had limitations in her understanding and memory due to poor comprehension, in her sustained concentration and pace because she cannot follow instructions, and in her social interactions because of her poor hygiene, anxiety and anger.  (R. 323.)  Dr. Tallaj also found Mayor limited in adaption.  (R. 324.)  Dr. Tallaj stated that he could not "provide a medical opinion

---

[3]      Annular means "shaped like a ring."  Dorland's Illustrated Medical Dictionary at 94.

[4]      Stenosis is "an abnormal narrowing of a duct or canal."   Dorland's Illustrated Medical Dictionary at 1769.

regarding [Mayor's] ability to do work-related activities" (id.), but opined that although Mayor is "not currently able to function in [a] work-like setting, but with psych evaluation she can be able to work" (R. 321, 324).

On March 20, 2012, Dr. Dmitri Bougakov performed a consultative psychiatric evaluation. (R. 367-70.) Mayor reported difficulty falling asleep, poor appetite, "dysphoric moods, loss of interest, low energy, concentration difficulties, diminished sense of pleasure, and social withdrawal." (R. 367.) On examination, Mayor was cooperative and related adequately. (R. 368.) Mayor had normal gait, posture and motor behavior, with appropriate eye contact. (Id.) Mayor's thought processes were coherent and goal directed. (Id.) Mayor's affect was dysphoric and mood was dysthymic. (Id.) Mayor was oriented to person, place and time but not to her own age. (R. 368.) Mayor's attention and concentration were "[i]mpaired," although Dr. Bougakov noted that "[t]his is likely to be related to inadequate effort." (Id.) Mayor's recent and remote memory skills were also "impaired related [to] inadequate effort." (Id.) Mayor's insight and judgment were fair. (Id.) According to Dr. Bougakov, "[o]n a daily basis, [Mayor] is able to dress, bathe, and groom herself. She reports that her sister does all the chores for her at this time. She . . . does not take public transportation. She does not really spend time with friends, but has a good relationship with her son and her sister." (R. 369.) Dr. Bougakov opined that:

> [Mayor] should be able to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, [and] maintain a good schedule. [Mayor] possibly has mild limitations in her ability to learn new tasks and cannot perform complex tasks. [Mayor] should be able to make appropriate decisions, relate adequately with others, and deal with stress. [Mayor's] difficulties are related to psychiatric problems and lack of motivation.

> Results of the evaluation appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with [Mayor's] ability to function on a daily basis.

(R. 369.)  Dr. Bougakov diagnosed an adjustment disorder with depressed mood, back pain, and obesity.  (R. 369.)  Dr. Bougakov's prognosis for Mayor was "[f]air, given the fact that her psychiatric symptoms are mild," noting that "with appropriate treatment, [Mayor] should be able to return to normal levels of functioning."  (R. 370.)

On March 20, 2012, Dr. Catherine Pelczar-Wissner conducted a consultative internal medicine examination.  (R. 371-73.)  Mayor's chief complaint was back pain.  (R. 371.)  Mayor also complained of "occasional headaches" and "some depression."  (Id.)  Mayor said "she does cooking, cleaning, laundry, and shopping with her sister's help."  (Id.)  Mayor showers and dresses.  (Id.)  Mayor "appeared to be moderately obese and in no acute distress."  (R. 372.)  Mayor had normal gait and stance.  (Id.)  Mayor "[n]eeded no help changing for exam or getting on and off exam table.  Able to rise from chair without difficulty."  (Id.)  Mayor's "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally."  (Id.)  Mayor's "[l]umbar spine shows flexion and extension 0 through 70, full lateral flexion bilaterally, and full rotary movement bilaterally."  (Id.)  Dr. Pelczar-Wissner's diagnosis was "[c]omplaint of low back pain," psychiatric problems, and depression.  (R. 373.)  The prognosis was stable.  (Id.)  Dr. Pelczar-Wissner opined that Mayor has a "mild restriction for heavy lifting and carrying."  (Id.)

On April 24, 2012, Dr. V. Reddy, a state agency consultant, reviewed the record and completed a Psychiatric Review Technique Form.  (R. 374-92.)  Dr. Reddy diagnosed an adjustment disorder with depressed mood.  (R. 377.)  Dr. Reddy reported that Mayor had moderate difficulties in maintaining concentration, persistence or pace.  (R. 384.)  Mayor had moderate limitations on her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods and perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to make simple work-related

decisions.  (R. 388.)  Additionally, Mayor had moderate limitations on her ability to accept instructions and respond appropriately to criticism from supervisors, ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in work setting and to set realistic goals or make plans independently of others.  (R. 389.)

On June 28, 2012, Dr. Rochel completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  (R. 393-95.)  Dr. Rochel found Mayor's ability to make judgments on complex and simple work-related decisions is markedly impaired, ability to carry out simple instructions, understand and remember complex instructions, and carry out complex instructions is moderately impaired, and ability to understand and remember simple instructions mildly impaired.  (R. 393.)  Dr. Rochel noted that "Ms. Mayor is exhibiting symptoms of a severe depressive episode, which limits ability to perform self-care activities, including bathing, eating and shopping. Poor concentration impacts her ability to make even simple decisions, let alone work-related responsibilities."  (Id.)  Additionally, "Ms. Mayor's irritable and depressed moods limit her ability to respond appropriately to others."  (R. 394.)

Finally, in an April 20, 2013 letter, Rio reported that Mayor's depression "interfer[ed] with her ability to work, take care of her home, and get along with others."  (R. 397.)

**ALJ Hecht's Decision**

On May 20, 2013, ALJ Hecht denied Mayor's application for benefits.  (R. 63-73.)  ALJ Hecht applied the appropriate five-step analysis.  (See R. 63-73.)  At step one, ALJ Hecht found that Mayor "has not engaged in substantial gainful activity since December 23, 2011, the alleged onset date." (R. 65.)

At step two, ALJ Hecht found that Mayor "has the following severe impairments:

obesity, L4-L5 disc bulge with right foraminal annular tear, and L5-S1 disc bulge that results in bilateral neural foramen stenosis." (Id.)  ALJ Hecht determined that Mayor's "history of ovarian abscesses in her tubes and fibromas in her uterus" was not a severe impairment because surgical procedures to treat them "were successful in controlling [Mayor's] pain symptoms." (Id.)

ALJ Hecht also found that Mayor's "medically determinable mental impairment of major depression does not cause more than minimal limitation in [Mayor's] ability to perform basic mental work activities and is therefore nonsevere." (R. 66)  In making that determination, ALJ Hecht "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the 'paragraph B' criteria." (Id.) According to ALJ Hecht:

> The first functional area is activities of daily living.  In this area, [Mayor] has mild limitation.  She completed an Activities of Daily Living Report, in which she alleged having no motivation for her personal care and no energy for the household chores.  She denied having any hobby.  Dr. [Ramon Tallaj][5/] completed a medical report, in which he indicated [Mayor] usually stays in bed.  He also reported that [Mayor] has a poor appearance and poor hygiene.  Dr. [Tallaj's] statements contrast with other evidence in the record.  During a mental status examination conducted on February 2, 2012, Dr. Henry Rochel, a treating psychiatrist, did not describe significant clinical findings in support of the above-mentioned limitations. Certainly, [Mayor] verbalized symptoms of sadness, crying spells, concentration problems, memory deficits, and feelings of helplessness.  However, Dr. Rochel reported an almost [un]remarkable mental examination, except for depressed mood. Ms. Rebecca Rio, LMSW, [Mayor's] therapist, noted that [Mayor] was well groomed, with heavy makeup, and appropriately dressed.  During the internist consulting examination with Dr. Catherine Pelczar-Wissner, [Mayor] indicated that she does the cooking, cleaning, laundry, and shopping with her sister's help.  Given the almost unremarkable mental examination by Dr. Rochel, Ms. Rio's observations, and [Mayor's] statements during the physical examination, [ALJ Hecht] finds [Mayor] only has mild limitations in her activities of daily living.

---

[5/]   Throughout his decision, ALJ Hecht erroneously referred to Dr. Ramon Tallaj as Dr. Ramon. (R. 66-70; see Dkt. No. 13: Mayor Br. at 10 n.15; Dkt. No. 15: Comm'r Br. at 2 n.2.)

The next functional area is social functioning.  In this area, [Mayor] has mild limitation.  In the aforementioned Activities of Daily Living Report, [Mayor] indicated having no friends. [Mayor] also stated that she does not spend time with family members.  Ms. Rio indicated [Mayor] was very angry at her situation of unemployment. Dr. [Tallaj] also indicated [Mayor] has limited social interaction due to poor hygiene, anxiety, and anger.  Notwithstanding [Mayor's] symptoms of anger and Dr. [Tallaj's] statements, Dr. Rochel noted [Mayor's] attitude was cooperative. She related well with him.  Dr. Dmitri Bougakov, a consulting psychiatrist, observed [Mayor] was cooperative and related adequately during the evaluation.  Her motor behavior was normal and her eye contact was appropriate.  Even more, the consulting psychiatrist reported [Mayor] has a good relationship with her son and her sister.  Taking into consideration, the clinical observations of Dr. Rochel and Dr. Bougakov, [ALJ Hecht] concludes that [Mayor] only has mild limitations in her social functioning.

The third functional area is concentration, persistence or pace.  In this area, [Mayor] has no limitation.  During the consulting mental examination with Dr. Bougakov, [Mayor] exhibited difficulties in her attention, concentration, and memory.  However, these deficits were due to inadequate effort.  Therefore, the cognitive deficiencies documented by Dr. Bougakov were not secondary to a mental impairment, but to [Mayor's] conscious inadequate effort. [Mayor's] apparent deficiencies in her attention, concentration, and memory contrast with the findings reported by Dr. Rochel.  On February 2, 2012, the treating psychiatrist noted [Mayor] was oriented to person, place, time, and situation.  There were no gross deficits in her attention, calculation, and recall.  Based on Dr. Rochel's findings, [ALJ Hecht] finds no limitations in [Mayor's] concentration, persistence, and pace.

The fourth functional area is episodes of decompensation.  In this area, [Mayor] has experienced no episodes of decompensation, which have been of extended duration.  The record evidence fails to reveal exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. There is no evidence of significant alteration in medication or documentation of the need for a more structured psychological support system (hospitalizations, for example) in order to stabilize [Mayor].

(R. 66-67, record citations omitted.)

Before proceeding to step three, ALJ Hecht noted that his "following residual functional capacity assessment reflects the degree of limitation" found at step two, and explained in detail the weight he gave to the medical opinions in the record in "reaching the conclusion that [Mayor] has no severe mental impairment."  (R. 67–69.)  ALJ Hecht gave little weight to Dr.

Rochel's June 28, 2012 medical source statement because "Dr. Rochel's prior findings and Dr. Bougakov's clinical observations indicate a non-severe mental impairment." (R. 67.) ALJ Hecht also gave little weight to Dr. Tallaj's February 7, 2012 report -- in which Dr. Tallaj "stated that [Mayor] is not currently able to function in [a] work-like setting, but with psychiatric evaluation she can be able to work," and described Mayor as having or reporting numerous symptoms and limitations -- "except for [Dr. Tallaj's] statement that [Mayor] can be able to work with psychiatric treatment." (R. 67-68.) ALJ Hecht determined that Dr. Tallaj's "findings contrast with Dr. Rochel's clinical observations documented on February 2, 2012." (R. 68.) ALJ Hecht noted that "it is pertinent to indicate that Dr. [Tallaj] is not a psychiatrist. Thus, he rendered a medical opinion in an issue outside his area of expertise." (Id.) ALJ Hecht gave great weight to Dr. Bougakov's opinion that Mayor had "a fair prognosis," her "psychiatric symptoms were mild," and "with appropriate treatment, [she] should be able to return to normal levels of functioning" because ALJ Hecht found it "compatible with the clinical findings reported by Dr. Rochel on February 2, 2012." (Id.) ALJ Hecht gave little weight to Rio's opinion that Mayor suffered from numerous mental limitations because "record evidence only shows treatment with Ms. Rio on January 26, 2012 and February 7, 2012" and Rio's opinion was "not accompanied by updated progress notes indicating [Mayor's] symptoms and limitations." (Id.) Finally, ALJ Hecht rejected Dr. Reddy's opinion that Mayor had "moderate restrictions in her concentration, persistence, or pace, since it is incompatible with the clinical observations reported by Dr. Rochel on February 2, 2012." (R. 68-69.) ALJ Hecht, however, concurred with Dr. Reddy's opinion that Mayor had "mild limitations in her activities of daily living and social functioning, since said opinion is supported by the preponderance of evidence." (R. 69.)

At the third step, ALJ Hecht found that Mayor "does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 69.) In doing so, ALJ Hecht "reviewed all of the evidence and determined that [Mayor's] impairments are not attended by the clinical and laboratory findings which are the same as or equivalent to the medical criteria specified in any Section in Appendix 1, Subpart P, Regulation No. 4." (R. 69.)

ALJ Hecht determined that Mayor "has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)." (R. 69.) ALJ Hecht "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id.) ALJ Hecht "also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 69.) ALJ Hecht followed a "two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) -- i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques -- that could reasonably be expected to produce [Mayor's] pain or other symptoms. Second, once an underlying physical or mental impairment(s) . . . has been shown, [he] must evaluate the intensity, persistence, and limiting effects of [Mayor's] symptoms to determine the extent to which they limit [Mayor's] functioning." (Id.) ALJ Hecht found that Mayor's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Mayor's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 70.)

ALJ Hecht found that "the objective evidence in the record shows positive findings" for Mayor's alleged back pain, based on the results of Mayor's lumbar MRI from April 2, 2013. (Id.) ALJ Hecht noted that Mayor's primary care physician Dr. Swarupa Gaddipati observed no spinal

tenderness when examining Mayor.  (Id.)  ALJ Hecht discussed in detail Dr. Pelzcar-Wissner's

consultative examination results and gave great weight to Dr. Pelzcar-Wissner's opinion that Mayor

had a mild restriction on heavy lifting or carrying because "it is supported by her clinical findings

and is consistent with the objective evidence in the record."  (Id.)  ALJ Hecht gave little weight,

however, to Dr. Tallaj's February 7, 2012 opinion that Mayor only can lift and carry less than ten

pounds and stand for less than two hours per day, because Dr. Tallaj "did not provide positive

clinical findings in support of his opinion" and "did not mention [Mayor's] back disorder as an

impairment affecting her functional capabilities."  (Id.)

> ALJ Hecht found that:
>
> The treatment history is incompatible with [Mayor's] allegations of disability and compatible with the residual functional capacity assessment reached in this decision.  The record shows no treatment with Dr. Swarupa Gaddipati, after January 24, 2012.  However, laboratory and cardiovascular tests were conducted in 2013.  The fact that the record does not indicate ongoing medical treatment with her primary care physician render [Mayor's] allegations of disabling back pain less credible.
>
> In terms of treatment, [Mayor] is taking Ibuprofen 500 mg for her pain symptoms.  The record does not show physical therapy, acupuncture, epidural blocks or other aggressive treatment for her pain symptoms.  Even more, no emergency room treatment for her pain symptoms is documented in the record.  In light of the above, [ALJ Hecht] finds [Mayor's] treatment was conservative.
>
> Certainly, [Mayor] alleged limitations in her activities of daily living.  During the psychological examination, [she] stated that her sister does all the chores for her.  She does not use a cell phone, does not manage money, and does not take public transportation.  However, during the consulting examination with Dr. Pelzcar-Wissner, [Mayor] indicated that she does the cooking, cleaning, laundry, and shopping with her sister's help.  The fact that [Mayor] has provided inconsistent statements regarding her activities of daily living, render her allegations of disability as less credible.
>
> Even if [Mayor's] allegations during the psychological examination were bona fide, two factors weigh against considering these allegations to be strong evidence in favor of finding [Mayor] disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.

> Secondly, even if [Mayor's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Mayor's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

(R. 70-71, record citations omitted.)

ALJ Hecht next "considered the effects of [Mayor's] obesity and included those effects within the determination of [Mayor's] residual functional capacity." (R. 71.) After a detailed discussion of the potential effects of obesity on residual functional capacity ("RFC"), ALJ Hecht calculated that Mayor's body mass index indicated "Level II" obesity, based on Mayor's height and weight as reported to Dr. Pelczar-Wissner. (Id.) ALJ Hecht found it "reasonable to conclude that the weight issue would help support reducing the functional capacity to the light exertional level." (R. 71.) In sum, "[b]ased on [Mayor's] obesity, back disorder, mild clinical findings, the conservative treatment provided, the medical opinion of Dr. Pelczar-Wissner, and the treatment history," ALJ Hecht found that Mayor had the RFC to perform the "full range of light work as defined in 20 CFR 404.1567(b)." (R. 72.)

At the fourth step, ALJ Hecht determined that Mayor "is unable to perform any past relevant work." (Id.) At the fifth step, ALJ Hecht found that "[c]onsidering [Mayor's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mayor] can perform." (Id.) In reaching that conclusion, ALJ Hecht relied solely on the "Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2," in particular "Medical-Vocational Rule 202.18." (R. 72.)

ALJ Hecht therefore found that Mayor "has not been under a disability, as defined in the Social Security Act, from December 23, 2011 through" the decision date of May 20, 2013. (R. 72-73.)

**Additional Evidence And The Appeals Council's Decision**

On June 10, 2013, Mayor requested review of ALJ Hecht's decision by the Appeals Council.  (R. 56.)  In support of her appeal, Mayor submitted additional evidence to the Appeals Council.  (See R. 5.)  On November 28, 2014, the Appeals Council denied Mayor's request for review.  (R. 1-4.)  In reaching its decision, the Appeals Council considered the reasons Mayor disagreed with ALJ Hecht's decision and her additional evidence.  (R. 1-2.)  It rejected some of the evidence submitted by Mayor as not new because it already appeared in the record, and some because it pertained to a time after  ALJ Hecht's opinion.  (R. 2.)  With respect to the remainder of the newly-submitted evidence, the Appeals Council held that "the additional evidence does not provide a basis for changing the [ALJ's] decision."  (Id.)  ALJ Hecht's opinion therefore became the final decision of the Commissioner.

The additional evidence Mayor submitted to the Appeals Council relevant to this decision includes records from Dr. Tallaj from March and April 2013 that the SSA admits were not part of the record before ALJ Hecht.  (See Dkt. No. 15: Comm'r Br. at 9, 22.)  On March 7, 2013, Mayor saw Dr. Tallaj.  (R. 448-51.)  Mayor reported Mayor's PHQ-9 score was 13, signifying "moderate depression."  (R. 448.)  Dr. Tallaj referred Mayor for an MRI of her lumbar spine. (R. 451.)[6/]  On April 12, 2013, Dr. Tallaj noted that Mayor had an orthopedist referral for her back, and was using icy hot patches and Advil for her pain.  (R. 445, 446.)[7/]

_____

[6/]     Apparently the MRI Mayor underwent on April 2, 2013.  (See page 5-6 above.)

[7/]     Mayor, who is represented by experienced counsel, does not challenge the Appeals Council's determination that her additional evidence does not provide a basis for overturning ALJ Hecht's opinion.  (See generally Dkt. No. 13: Mayor Br.)  Instead, Mayor relies upon the additional evidence in only two instances: first, to argue that ALJ Hecht "erred by assuming the Ms. Mayor was not receiving ongoing treatment from primary care physician Dr. Tallaj" (continued...)

# ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[8]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him,

---

[7]   (...continued)
(Mayor Br. at 19), and second, to argue that ALJ Hecht gave too much weight to Dr. Bougakov's one-time examination because Dr. Rochel and Rio noted that Mayor has good and bad days (Mayor Br. at 11).   Therefore, the Court has summarized the evidence Mayor submitted subsequent to ALJ Hecht's decision only to the extent that she relied on it in her papers.

[8]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[9/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[10/]

B.    **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[11/]  "Thus, the role of the district court is quite limited and substantial deference is to be afforded the

---

[9/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[10/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[11/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[12/]

      The Supreme Court has defined "substantial evidence" as '"more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74.[13/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to '"substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de novo</u> review.'" <u>Jones</u> v. <u>Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).[14/]

      The Court, however, will not defer to the Commissioner's determination if it is '"the product of legal error.'" <u>E.g.</u>, <u>Duvergel</u> v. <u>Apfel</u>, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Douglass</u> v. <u>Astrue</u>, 496 F. App'x 154, 156 (2d Cir. 2012); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101

---

[12/]   See also, <u>e.g.</u>, <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[13/]   See also, <u>e.g.</u>, <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 31; <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 184; <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 61; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46.

[14/]   See also, <u>e.g.</u>, <u>Campbell</u> v. <u>Astrue</u>, 465 F. App'x 4, 6 (2d Cir. 2012); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586.

(2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[15/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  <u>See</u>,

---

[15/]  Accord, <u>e.g.</u>, <u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 774; <u>see also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[16/]

## C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[16/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010).[17/]

       When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

       The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

**D.**    **The ALJ's Duty To Develop The Record**

       It is the "well-established rule in [the Second] circuit" that the ALJ must develop the

---

[17/]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

record:

> [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on other grounds], 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant).  Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).  "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).  This duty is heightened when a claimant

proceeds pro se.  See, e.g., Moran v. Astrue, 569 F.3d at 113; Hamilton v. Colvin, 10 Civ. 9641,

2013 WL 3814291 at *13 (S.D.N.Y. July 23, 2013).

## II.   ALJ HECHT PROPERLY DEVELOPED THE RECORD

Mayor argues that in determining whether Mayor's mental impairments were severe,

ALJ Hecht failed to adequately develop the record because he "failed to take any steps to develop

the record by contacting the treating physicians or even making [Mayor] aware of his concerns about

their opinions." (Dkt. No. 13: Mayor Br. at 16.)  Because legal error would warrant remand, Tejada

v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999), the Court will address the correctness of the legal

standards applied first.

ALJ Hecht's conclusion that Mayor had no severe mental impairments was based on

medical records from Mayor's treating psychiatrist Dr. Rochel, her treating physician Dr. Tallaj, her

therapist Rio, consultative examiners Dr. Bougakov and Dr. Pelczar-Wissner, and state agency

review psychologist Dr. Reddy.  (R. 65-69.)  The record contained two years of treatment notes from

Dr. Tallaj.  (See pages 3-4 above.)[18/]  "'[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (quoting Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)))[19/]  A contrary opinion from a treating physician does not create an obvious gap in the record, triggering the ALJ's obligation to seek clarifying information.  See, e.g., Petti v. Colvin, No. 13-CV-267, 2014 WL 6783703 at *13 (E.D.N.Y. Dec. 2, 2014) (The ALJ "considered a complete medical record without clear or obvious gaps.  Therefore, the ALJ was not required to seek out additional information and could ascribe limited weight to [the treating physician's] opinion . . . ."); Bell v. Colvin, No. 12-CV-1527, 2013 WL 6283834 at *3 (N.D.N.Y. Dec. 4, 2013) (The ALJ "had before him [claimant's] treatment records, objective medical evidence, including x-rays and MRIs, and [a treating physician's] opinion that [the claimant] could perform sedentary work. . . .   The court is satisfied

---

[18/]    The additional evidence Mayor submitted to the Appeals Council included additional treatment records from Dr. Tallaj from the period at issue that had not been in ALJ Hecht's possession when he rendered his decision.  (See page 16 above.)  Although these records contain some mental health findings, they do not undermine ALJ Hecht's decision; in fact, Mayor's PHQ-9 score from March 2013 indicates only moderate depression (see page 16 above), an improvement over several PHQ-9 scores already in the record before ALJ Hecht (see pages 4-5 above).  Moreover, Mayor does not argue the contrary (see generally Mayor Br.), and has not challenged the Appeals Council's determination that these records do not support overturning ALJ Hecht's opinion (see page 16 n.7 above.)

[19/]    See also, e.g., Ramos v. Comm'r of Soc. Sec., 13 Civ. 6561, 2015 WL 708546 at *18 (S.D.N.Y. Feb. 4, 2015) (ALJ had no further obligation to develop the record where the medical record from the treating clinic was "extensive, including more than two years of consistent treatment notes."); Matos v. Colvin, 13 Civ. 4525, 2014 WL 3746501 at *9 (S.D.N.Y. July 30, 2014) (ALJ properly fulfilled duty to develop the record where he questioned claimant thoroughly, solicited testimony from medical and vocational experts and admitted voluminous submissions from physicians.), aff'd, 618 F. App'x 14 (2d Cir. 2015).

that further development of the record was unnecessary as the ALJ had before him substantial evidence that enabled him to render a decision."); <u>Oliphant</u> v. <u>Astrue</u>, No. 11-CV-2431, 2012 WL 3541820 at *20 (E.D.N.Y. Aug. 14, 2012) ("The ALJ subpoenaed comprehensive medical records from . . . all known treating physicians and compiled a voluminous record . . . .   There was no 'gap' in the record; rather, there was an absence of evidence of neurological deficits. . . .   Consequently, the ALJ was not required to seek additional information.").

Accordingly, the Court finds that ALJ Hecht adequately developed the record.

## III.   <u>ALJ HECHT'S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE</u>

### A.   <u>Mayor Was Not Engaged In Substantial Gainful Activity</u>

The first inquiry is whether Mayor was engaged in substantial gainful activity after her application for benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  Since ALJ Hecht's conclusion that Mayor did not engage in substantial gainful activity during the applicable time period (<u>see</u> page 9 above) benefits Mayor, the Court proceeds to the second step of the five-step analysis.

### B.   <u>Mayor Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Functions, But Her Mental Impairments Were Not Severe</u>

The second step of the analysis is to determine whether Mayor proved that she had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling

> . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).  "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"  McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), R. & R. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[20]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of  'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to

---

[20] Accord, e.g., Whiting v. Astrue, No. Civ. A. No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), R. & R. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

work.'"  <u>Rosario</u> v. <u>Apfel</u>, 1999 WL 294727 at *5 (quoting <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 154

n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

   ALJ Hecht found that Mayor "has the following severe impairments: obesity, L4-L5

disc bulge with right foraminal annular tear, and L5-S1 disc bulge that results in bilateral neural

foramen stenosis."  (<u>See</u> page 9-10 above.)  Neither Mayor nor the Commissioner challenge ALJ

Hecht's determination that these impairments were severe.  (<u>See generally</u> Dkt. No. 13: Mayor Br.;

Dkt. No. 15: Comm'r Br.)

   ALJ Hecht found that Mayor has no severe mental impairments.  (<u>See</u> page 10

above.)  Mayor challenges that determination on the ground that ALJ Hecht improperly gave little

weight to the mental limitations described by treating physician Dr. Tallaj, disregarded treating

psychiatrist Dr. Rochel's opinion that Mayor has several marked limitations, and improperly gave

too much weight to the opinion of consultative examiner Dr. Bougakov.  (<u>See</u> Mayor Br. at 9-17.)

   In determining whether a mental impairment is severe at step two, the ALJ  must

follow a "special technique" whereby the ALJ rates the degree of functional limitation resulting from

the impairment in four broad areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(a)-

(c); <u>accord</u>, <u>e.g.</u>, <u>Petrie</u> v. <u>Astrue</u>, 412 F. App'x 401, 408 (2d Cir. 2011); <u>Hernandez</u> v. <u>Comm'r of

Soc. Sec.</u>, 13 Civ. 5625, 2015 WL 5122523 at *16 (S.D.N.Y. Aug. 31, 2015); <u>Matthew</u> v. <u>Colvin</u>,

No. 13-CV-5336, 2015 WL 5098662 at *4 (E.D.N.Y. Aug. 31, 2015).  "'[I]f the degree of limitation

in each of the first three areas is rated "mild" or better, and no episodes of decompensation are

identified, then the reviewing authority generally will conclude that the claimant's mental

impairment is not "severe" and will deny benefits.'"  <u>Petrie</u> v. <u>Astrue</u>, 412 F. App'x at 408 (quoting

<u>Kohler</u> v. <u>Astrue</u>, 546 F.3d 260, 266 (2d Cir. 2008)); <u>see also</u>, <u>e.g.</u>, 20 C.F.R. § 404.1520a(d)(1);

Matthew v. Colvin, 2015 WL 5098662 at *4; Coleman v. Colvin, 14 Civ. 2384, 2015 WL 1190089 at *8 (S.D.N.Y. Mar. 16, 2015).

ALJ Hecht comprehensively applied this technique to find that Mayor had mild limitations in her activities of daily living and social functioning, no limitations to her concentration, persistence or pace, and no episodes of decompensation of extended duration, and he therefore concluded that Mayor's depression was not a severe impairment.  (See pages 10-11 above.)

ALJ Hecht's conclusion is supported by substantial evidence in each area.  Dr. Rochel's February 2, 2012 examination did not find Mayor significantly limited in her activities of daily living.  (See page 5 above.)  Rio repeatedly observed that Mayor was well-groomed, with heavy makeup and appropriate dress.  (See page 4 above.)  Moreover, Mayor told Dr. Pelczar-Wissner that she does the cooking, cleaning, laundry and shopping with her sister's help (see page 8 above), indicating independence in her activities of daily living.  Nonetheless, ALJ Hecht took into consideration Mayor's statements about her limitations in daily activities and Dr. Tallaj's observations when he found that Mayor has mild limitations in this area.  (See page 10 above.)

Similarly, Dr. Rochel's February 2, 2012 examination found Mayor's attitude cooperative (see page 5 above), and Dr. Bougakov similarly observed that Mayor was cooperative and related adequately (see page 7 above).  Dr. Bougakov also noted that Mayor had a good relationship with her son and sister.  (See page 7 above.)  All of this evidence supports ALJ Hecht's finding that Mayor had only mild social limitations notwithstanding Mayor's statements and Dr. Tallaj's opinion that she has limited social interaction.  (See page 11 above.)

ALJ Hecht's determination that Mayor has no limitations on concentration, persistence or pace relied on findings by Dr. Bougakov and Dr. Rochel.  Dr. Bougakov noted that Mayor had several impairments in her attention, concentration and memory, but opined that these

were due to "inadequate effort."  (See page 7 above.)  Dr. Rochel's February 2, 2012 mental status examination findings for Mayor were largely unremarkable aside from a depressed mood and a GAF score on the borderline between moderate and serious symptoms.  (See page 5 above.)  Dr. Rochel found that Mayor had a cooperative attitude; normal eye contact and gait; a logical, goal directed thought process; a kempt appearance; a normal affect; and no gross deficits in registration, attention and calculation, recall, language, visual-motor integrity, insight or judgment.  (See page 5 above.) Dr. Rochel further noted that Mayor had no suicidal or homicidal ideation and no risk of self-harm of violence, and was oriented to person, place, time and situation.  (See page 5 above.)  Substantial evidence therefore supports ALJ Hecht's finding that Mayor's concentration, persistence and pace suffer from no limitations.  Finally, as ALJ Hecht found (see page 11 above), the record also contains no evidence that Mayor experienced an episode of decompensation of extended duration during the period at issue.

Mayor, however, claims that ALJ Hecht erred by giving little weight to the opinions of her treating psychiatrist Dr. Rochel and her treating physician Dr. Tallaj.  (Mayor Br. at 10.) Even though "the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[21/]  Furthermore, "the opinion of a treating physician,

---

[21/]     Accord, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014); Petrie v. Astrue, 412 F. App'x at 405; Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel,
(continued...)

or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[22/]   Moreover, in rejecting a treating physician's opinion, an ALJ need not expressly enumerate each factor considered if the ALJ's reasoning and adherence to the treating physician rule is clear.  See, e.g., Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (plaintiff "challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c).  We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did not discuss the treating physician rule, but where "the substance of the treating physician rule was not traversed").

   ALJ Hecht properly gave little weight to Dr. Rochel's medical source statement opining that Mayor had several marked limitations as a result of her mental impairments.  (See pages 11-12 above.)  As ALJ Hecht observed, "Dr. Rochel's prior findings and Dr. Bougakov's clinical

---

[21/]   (...continued)
177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'").

[22/]   See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d at 133; Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), R. & R. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

observations indicate a non-severe mental impairment." (R. 67.)  The only prior treatment records from Dr. Rochel, i.e., the notes from Mayor's February 2, 2012 visit, showed essentially normal mental status examination results, including that Mayor had a cooperative attitude, normal eye contact, was coherent and logical, and had no gross deficits in registration, attention and calculation, recall, language, visual-motor integrity, insight or judgment.  (See page 5 above.)  Dr. Rochel further observed that Mayor had a kempt appearance and found her GAF score to be 50, in the moderate range.  (See page 5 above.)  Dr. Bougakov similarly found only that Mayor "possibly has mild limitations in her ability to learn news tasks and cannot perform complex tasks."  (See page 7 above.)  Dr. Bougakov also opined that Mayor "should be able to make appropriate decisions, relate adequately with others, and deal with stress," and that although the "[r]esults of the evaluation appear to be consistent with psychiatric problems . . . in itself, this does not appear to be significant enough to interfere with [Mayor's] ability to function on a daily basis."  (See page 7 above.)  His overall prognosis was that "with appropriate treatment, [Mayor] should be able to return to normal levels of functioning."  (See page 8 above.)

ALJ Hecht gave little weight to Dr. Tallaj's opinion because it was contradicted by Dr. Rochel's February 2, 2012 clinical findings.  (See page 12 above.)  ALJ Hecht was correct that Dr. Rochel found Mayor to have an unremarkable mental status examination, aside from a depressed mood, with no cognitive difficulties or gross impairments in her impulse control, insight or judgment, and a cooperative attitude.  (See page 5 above.)  ALJ Hecht also relied on treatment notes from Mayor's therapist, Rio, and observations from consultative physician Dr. Pelczar-Wissner and consultative psychiatrist Dr. Bougakov to reject Dr. Tallaj's conclusions about the extent of Mayor's limitations in activities of daily living.  (See page 12 above.)  As noted by ALJ Hecht (see page 12 above), Rio's January 2012 observation that Mayor was well-groomed and appropriately dressed

(see page 4 above) is inconsistent with Dr. Tallaj's opinion that Mayor has poor appearance and poor hygiene (see page 6 above).   Similarly, while Dr. Tallaj opined that Mayor usually stays in bed (see page 6 above), Mayor reported to Dr. Pelczar-Wissner that she does the cooking, cleaning, laundry and shopping with her sister's help (see page 8 above).[23/]

Mayor argues "although Dr. Bougakov did not find Ms. Mayor as limited as the treating psychiatrist, his findings are still inconsistent with a conclusion that [Mayor] did not have any work-related mental limitations" because "Dr. Bougakov opined that Ms. Mayor was limited to simple directions and performing simple tasks." (Mayor Br. at 11.)   This overstates Dr. Bougakov's findings.   Dr. Bougakov found that Mayor "should be able to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, [and] maintain a good schedule. [Mayor] possibly has mild limitation in her ability to learn new tasks and cannot perform complex tasks." (See page 7 above.)   Dr. Bougakov, however, further found that Mayor had a fair prognosis because her psychiatric symptoms were mild, that she "should be able to return to normal levels of functioning," and that Mayor's "evaluation appear[s] to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with [Mayor's] ability to function on a daily basis." (See pages 7-8 above.)

It is well-settled that a consulting physician's opinion can constitute substantial

---

[23/]     ALJ Hecht stated that "it is pertinent to indicate that Dr. [Tallaj] is not a psychiatrist.   Thus, he rendered a medical opinion in an issue outside his area of expertise." (See page 12 above.)   Mayor argues that "the fact that Dr. Tallaj is not a psychiatrist does not mean he is not qualified to comment on his patient's mental condition." (Mayor Br. at 15.)   Whether or not a physician is a specialist in the area of medicine upon which they render an opinion is one of the factors that an ALJ must consider when deciding not to give controlling weight to a treating physician's opinion.   20 C.F.R. § 404.1527(c)(5); see also cases cited at pages 21-22 above.   ALJ Hecht thus properly took into account the fact that Dr. Tallaj is not a psychiatrist when weighing his opinion against the mental status examination results from Dr. Rochel, Mayor's treating psychiatrist.

evidence supporting an ALJ's conclusions.  See, e.g., Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir. 2014) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own testimony, and the medical tests together constitute substantial evidence adequately supporting the [Commissioner's] conclusion that the plaintiff's injuries did not prevent her from resuming her job as a sewing machine operator."); Fuentes v. Colvin, No. 13-CV-6201, 2015 WL 631969 at *8 (W.D.N.Y. Feb. 13, 2015) ("'The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision.'"); Frawley v. Colvin, No. 13-CV-1567, 2014 WL 6810661 at *9 (N.D.N.Y. Dec. 2, 2014) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, [they are] supported by the medical evidence in the record."); Leisten v. Colvin, No. 12-CV-6698, 2014 WL 4275720 at *14 (W.D.N.Y. Aug. 28, 2014).

Mayor further claims ALJ Hecht gave too much weight to Dr. Bougakov's opinion because "opinions from a one-time examining source are generally entitled to less weight than a treating specialist."  (Mayor Br. at 11.)  An ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence.  See, e.g., Rosier v. Colvin, 586 F. App'x at 758 (ALJ properly relied on evaluations by a consultative examiner to reject treating physician's opinion where other substantial evidence in the record was inconsistent with treating physician's opinion); Rivera v. Colvin, 13 Civ. 7150, 2015 WL 1027163 at *16 (S.D.N.Y. Mar. 9, 2015) ("It is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion."); Frawley v. Colvin, 2014 WL 6810661 at *5-7, *9-10 (ALJ's decision to give great weight to the opinion of a consultative psychological examiner was supported by substantial evidence

because the opinion was consistent with the same medical evidence relied on by the ALJ to reject the treating psychologist's opinion); Manning v. Colvin, No. 13-CV-497, 2014 WL 5308189 at *8-9 (W.D.N.Y. Oct. 16, 2014) (ALJ properly gave little weight to the treating physician's opinion and "'great weight'" to the consultative examiner's prognosis because the consultative examiner's opinion was more consistent with the medical evidence of record); Leisten v. Colvin, 2014 WL 4275720 at *12-15 (ALJ did not err by affording treating doctor's opinions little weight and giving consultative examiners' opinions substantial weight because the treating doctor's opinion was inconsistent and unsupported while consultative examiners' opinions were supported by their examination results). ALJ Hecht gave great weight Dr. Bougakov's opinion because he found it to be "compatible with the clinical findings reported by Dr. Rochel on February 2, 2012." (See page 12 above.) Dr. Bougakov opined that although Mayor suffered from an adjustment disorder and depressed mood, she had only mild psychiatric symptoms and should be able to return to normal levels of functioning with appropriate treatment. (See page 8 above.) This is consistent with Dr. Rochel's essentially normal mental status examination results on February 2, 2012. (See page 5 above.) Moreover, ALJ Hecht's determination that Dr. Tallaj's and Dr. Rochel's opinions were entitled to little weight is supported by substantial evidence. (See pages 30-32 above.) Thus, having properly given those opinions little weight, ALJ Hecht was not required to give Dr. Bougakov's opinion less weight even though it was more consistent with Mayor's psychiatric treatment records. Because Dr. Bougakov's opinion could constitute substantial evidence and was consistent with Dr. Rochel's clinical findings from February 2, 2012, ALJ Hecht did not err in assigning it great weight.[24]

---

[24]  Mayor also claims that "the consultants in this case were not provided with any of [her] medical records despite 20 C.F.R. § 404.1517, which states '[w]e will [] give the examiner any necessary background information about your condition.'" (Mayor Br. at 11, quoting

(continued...)

Mayor also argues that ALJ Hecht "purported to give some weight to the non-examining psychologist [Dr. Reddy], but failed to explain why he found all the mental restrictions described by this expert were not supported.  He could not rely on the portions of the opinions that found Ms. Mayor not limited and reject the other findings without any explanation."  (Mayor Br. at 12.)  This argument misstates the record.  ALJ Hecht found that some of the mental restrictions

_____

[24/]     (...continued)
20 C.F.R. § 404.1517.)  The psychiatric history section of Dr. Bougakov's evaluation, however, states that Mayor had been seeing Dr. Rochel on a monthly basis for the three months prior to her examination, while the medical history section describes her history of hypertension and back pain, and notes her daily medications.  (R. 367.)  Although Dr. Pelczar-Wissner's report makes no mentions of Mayor's psychiatric history, Dr. Pelczar-Wissner was a consultative physician, not consultative psychiatrist.  (See page 8 above.)

Moreover, Mayor's reliance on Burgess v. Astrue, 537 F.3d 117, 132 (2d Cir. 2008), is misplaced.  (See Mayor Br. at 11.)  Contrary to Mayor's characterization, Burgess did not hold that the "a consultative examiner who did not review important medical evidence is 'not' to be considered substantial evidence."  (Mayor Br. at 11.)  Rather in "Burgess, a consultative examiner testified at the administrative hearing without having examined the claimant and without having reviewed a crucial MRI report in the administrative record.  In light of these circumstances, the Second Circuit provided guidance for the Commissioner on remand, noting . . . that the hearing testimony of the examiner was not included in the category of evidence that might substantially contradict the opinion of the claimant's treating doctor."  Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *13 (S.D.N.Y. Oct. 9, 2013) (citations omitted); see also Burgess v. Astrue, 537 F.3d at 125, 132.  The Burgess court also held that the opinion of a one-time examiner who lacked the same crucial MRI report could not be used to substantially contradict the opinion of the claimant's treating doctor because the report contradicted the examiner's conclusions.  See Burgess v. Astrue, 537 F.3d at 125, 132.

Here, in contrast, the records Dr. Bougakov purportedly lacked (in particular Dr. Rochel's February 2, 2012 treatment notes) support his conclusions.  Similarly, although ALJ Hecht used Dr. Bougakov's clinical observations to contradict Dr. Rochel's opinion and some of Dr. Tallaj's conclusions (see pages 12 above), both of those opinions also were contradicted by Dr. Rochel's  own treatment records (see page 5 above).  Furthermore, the only parts of Dr. Pelczar-Wissner's consultative examination that ALJ Hecht relied on in finding Mayor's depression non-disabling were Mayor's own reports of her activities of daily living.  (See page 10 above.)  "In any event, particularly where the consultative physician has directly examined plaintiff, there is no requirement that his opinion be disregarded because of a lack of review of prior records."  Marquez v. Colvin, 2013 WL 5568718 at *13.

identified by Dr. Reddy <u>were</u> supported.  (See pages 10-12 above.)  Specifically, ALJ Hecht concurred with Dr. Reddy's opinion that Mayor had mild limitations to her activities of daily living and social functioning.  (<u>See</u> page 10-12 above.)  Moreover, although ALJ Hecht rejected Dr. Reddy's finding that Mayor had moderate restrictions on her concentration, persistence or pace, (<u>see</u> page 12 above), ALJ Hecht explained that he did so because "it [was] incompatible with the clinical observations reported by Dr. Rochel on February 2, 2012," finding Mayor alert and oriented to person, place, time and situation, with no gross deficits in attention and calculation, language, recall, judgment or visual-motor integrity (<u>see</u> page 12 above).[25/]

**C.      Mayor Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Mayor had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Hecht found that notwithstanding Mayor's severe impairments, Mayor "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (<u>See</u> page 12-13 above.)

---

[25/]      Mayor further argues that, in any event, Dr. Reddy's opinion should have been given little weight because he is a non-examining source.  (Mayor Br. at 12-13.)  The opinions of non-examining sources like Dr. Reddy may be given greater weight than opinions from treating sources if they are supported by evidence in the record.  See, e.g., Prince v. Astrue, 514 F. App'x 18, 20 (2d Cir. 2013) (citing <u>Diaz</u> v. <u>Shalala</u>, 59 F.3d at 313 n.5); <u>see also</u>, <u>e.g.</u>, <u>Wells</u> v. <u>Comm'r of  Soc. Sec.</u>, 338 F. App'x 64, 66 (2d Cir. 2009); <u>Besignano</u> v. <u>Colvin</u>, No. 12-CV-6123, 2014 WL 4065090 at *9 (E.D.N.Y. Aug. 14, 2014); 20 C.F.R. § 404.1527(e).

In reaching that conclusion, ALJ Hecht "reviewed all of the evidence and determined that [Mayor's] impairments are not attended by the clinical and laboratory findings which are the same or equivalent to the medical criteria specified in any Section in Appendix 1, Subpart P, Regulation. No. 4."  (See page 13 above.)

Mayor is represented by experienced counsel who does not argue that any of the impairments ALJ Hecht found to be severe meet or equal a Listed condition.  (See generally Dkt. No. 13: Mayor Br.)  The Court therefore proceeds with the analysis.

### D.    Credibility and RFC Determinations

#### 1.    Credibility Analysis

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310

F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'")[26]  In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying."  Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[27]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a

---

[26]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[27]    Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[28]

ALJ Hecht found that Mayor's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible."  (see page 13 above.) In reaching that conclusion, ALJ Hecht independently considered Mayor's allegations regarding both her physical and psychological symptoms.  (See pages 13-15 above.)

First, ALJ Hecht acknowledged that "the objective evidence in the record shows positive findings" for Mayor's alleged back pain, based on the results of Mayor's lumbar MRI from April 2, 2013, but ALJ Hecht noted that Mayor's primary care physician Dr. Swarupa Gaddipati observed no spinal tenderness when examining Mayor.  (See page 13 above.)  ALJ Hecht discussed in detail Dr. Pelzcar-Wissner's consultative examination results and gave great weight to Dr. Pelzcar-Wissner's  opinion that Mayor had a mild restriction on heavy lifting or carrying because "it is supported by her clinical findings and is consistent with the objective evidence in the record."

---

[28]  Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

(See page 14 above.)  Finally, ALJ Hecht gave little weight to Dr. Tallaj's February 7, 2012 opinion that Mayor can only lift and carry less than ten pounds and stand for less than two hours per day, because Dr. Tallaj "did not provide positive clinical findings in support of his opinion" and "did not mention [Mayor's] back disorder as an impairment affecting her functional capabilities."  (See page 14 above.)  ALJ Hecht therefore concluded that the clinical findings for Mayor were mild.  (See page 14 above.)   ALJ Hecht then found that those mild findings, combined with Mayor's conservative treatment record, "render [Mayor's] allegations of disabling back pain as less credible."  (See page 14 above.)

Second, with respect to her psychological symptoms, ALJ Hecht found that Mayor "provided inconsistent statements regarding her activities of daily living" by claiming to be more limited during her psychological examination with Dr. Bougakov than during her examination by Dr. Pelczar-Wissner, which rendered "her allegations of disability as less credible."  (See page 14 above.)  ALJ Hecht further stated that "[e]ven if [Mayor's] allegations during the psychological examination were bona fide, two factors weigh against considering these allegations to be strong evidence in favor of finding [Mayor] disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly, even if [Mayor's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Mayor's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors."  (See page 14-15 above.)

Mayor argues that the "ALJ's findings were insufficient to find Ms. Mayor's testimony not credible" because "the ALJ cannot demand the presence of particular clinical or objective findings to support a claimant's allegations."  (Mayor Br. at 19, citing 20 C.F.R. § 404.1529(c)(2).)  Mayor is correct that an ALJ may not "reject [a claimant's] statements about the

intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work <u>solely</u> because the available objective medical evidence does not substantiate [her] statements," but objective medical evidence nonetheless "is a useful indicator to assist [the ALJ] in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effects those symptoms, such as pain, may have on [her] ability to work." 20 C.F.R. § 404.1529(c)(2) (emphasis added).

In reaching his credibility determination with respect to Mayor's statements about her mental symptoms, ALJ Hecht did not reject her statements solely because the available medical evidence failed to substantiate them. Instead, he primarily relied on the inconsistency between her statements to Dr. Bougakov and Dr. Pelczar-Wissner. (See page 14 above.) According to Dr. Bougakov, Mayor reported that "her sister does all the chores for her at this time. She . . . does not take public transportation." (See page 7 above.) Dr. Pelczar-Wissner, however, reported that Mayor said "she does cooking, cleaning, laundry, and shopping with her sister's help." (See page 8 above.)

Similarly, in rejecting Mayor's statements about her physical limitations, ALJ Hecht relied not only on the available medical evidence (which he found showed only mild symptoms), but also on her conservative treatment record.[29/] (See page 14 above.) As ALJ Hecht noted (see page 14 above), Mayor's only ongoing treatment for her pain was 500mg of Ibuprofen per day

---

[29/]    Mayor's assertion that "the ALJ erred by criticizing the treatment of her physical symptoms as 'conservative'" (Mayor Br. at 19) is without merit. Courts in this Circuit routinely uphold credibility determinations in which the ALJ finds a claimant's statements about their symptoms not credible based, <u>inter alia</u>, on a conservative treatment record. <u>See</u>, <u>e.g.</u>, <u>McGann</u> v. <u>Colvin</u>, 14 Civ. 1585, 2015 WL 5098107 at *10 (S.D.N.Y. Aug. 31, 2015); <u>Russitano</u> v. <u>Colvin</u>, No. 14-CV-403, 2015 WL 4496383 at *8-9 (N.D.N.Y. July 23, 2015); <u>Evans</u> v. <u>Comm'r of Soc. Sec.</u>, 14 Civ. 4093, --- F. Supp. 3d ----, 2015 WL 3885243 at *19 (S.D.N.Y. June 24, 2015); <u>Sagastivelsa-Garcia</u> v. <u>Colvin</u>, 12 Civ. 9168, 2014 WL 85121 at *2 (S.D.N.Y. Jan. 6, 2014).

(R. 240).  ALJ Hecht also accurately stated that the "record does not show physical therapy, acupuncture, epidural blocks or other aggressive treatment for [Mayor's] pain symptoms" and observed that Mayor has had no emergency room visit for her back pain.  (See page 14 above.) Thus, ALJ Hecht did not rely solely on medical evidence to reject Mayor's testimony about either her mental or physical symptoms.

Mayor further argues that ALJ Hecht "erred by assuming that Ms. Mayor was not receiving ongoing treatment from treating primary care physician Dr. Tallaj without making any attempts to obtain the record.  Treatment records provided to the Appeals Council showed just the opposite."  (Mayor Br. at 19.)  This argument is without merit.  First, as discussed in section II above, the medical record contained no obvious gaps suggesting that ALJ Hecht needed to further develop it, and actually included records from Dr. Tallaj stretching back three years prior to ALJ Hecht's decision.  (See pages 23-25 above.)  Moreover, the treatment records Mayor submitted to the Appeals Council do not contain evidence of ongoing treatment for her back pain beyond an MRI referral, an orthopedist referral and a reference to over-the-counter pain medication.  (See page 16 above.)  ALJ Hecht noted in his opinion that Mayor was "taking Ibuprofen 500 mg for her pain symptoms."  (See page 14 above.)  ALJ Hecht also took into account the lumbar spine MRI that Dr. Tallaj referred Mayor for in March 2013 (see page 16 above) when determining that her treatment history was incompatible with her allegations of disability.  (R. 70, "laboratory and cardiovascular tests were conducted in 2013.")  Thus, nothing in the records Mayor cites contradicts ALJ Hecht's finding that the "record does not show physical therapy, acupuncture, epidural blocks or other aggressive treatment for [Mayor's] pain symptoms," his observation that she has had no emergency room visit for her back pain, or his opinion that Mayor's treatment for her back pain generally has been conservative.  (See page 14 above.)

Thus, ALJ Hecht met his burden in finding Mayor not entirely credible because the objective medical evidence and her stated independence in activities of daily living failed to support her claims of disability.  See, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 21, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . .  where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Kessler v. Colvin, 13 Civ. 1760, 2014 WL 4651895 at *14 (S.D.N.Y. Sept. 17, 2014) (Claimant's "subjective complaints of pain lacked the necessary objective medical support, and therefore were not entitled to any special weight. Accordingly, the ALJ's adverse credibility determination was not erroneous."); Givens v. Colvin, 13 Civ. 4762, 2014 WL 1394965 at *10-11 (S.D.N.Y. Apr. 11, 2014) (Peck. M.J.) (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church."); Crayton v. Astrue, 944 F. Supp. 2d 231, 235 (W.D.N.Y. 2013) ("Plaintiff also challenges the ALJ's finding that plaintiff's complaints of disabling pain were not wholly credible . . . . Here, the ALJ rejected plaintiff's testimony based on several inconsistencies . . . . [P]laintiff's complaints of disabling pain appear to conflict with her medical treatment records, which reflect few complaints and no aggressive or additional treatment for back,

knee and wrist pain . . . . For example, plaintiff listed, among her activities of daily living, dressing and caring for herself, performing light housework and grocery shopping, and stated that she could lift ten pounds . . . . Given the inconsistencies between plaintiff's reports of disabling pain, other testimony by plaintiff and the rest of the record, I find no basis to disturb the ALJ's findings as to plaintiff's credibility."); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), R. & R. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2. RFC Determination

ALJ Hecht found that Mayor had "the residual functional capacity to perform the full range of light work as defined by 20 CFR 404.1567(b)." (See page 13 above.) In reaching that conclusion, ALJ Hecht considered Mayor's "obesity, back disorder, mild clinical findings, the conservative treatment provided, the medical opinion of Dr. Pelczar-Wissner, and the treatment history." (See page 15 above.) In particular, ALJ Hecht performed a detailed analysis of the effects of Mayor's obesity based on Dr. Pelczar-Wissner's findings and gave great weight to Dr. Pelczar-Wissner's opinion that Mayor's back pain left her with a mild restriction on heavy lifting and carrying. (See page 15 above.) ALJ Hecht gave little weight to Dr. Tallaj's opinion that Mayor can lift and carry no more than ten pounds and stand for less than two hours per day because Dr. Tallaj "did not mention [Mayor's] back disorder as an impairment affecting her functional capabilities" and "did not provide positive clinical findings in support of his opinion." (See page 14 above.)

Mayor, who is represented by counsel, has argued only that ALJ Hecht incorrectly determined that her depression is not a severe impairment and erroneously determined that her subjective statements about her symptoms lacked credibility. (See generally Dkt. No. 13: Mayor

Br.)  Because those arguments already have been addressed (see pages 27-44 above), and because

Mayor does not directly challenge ALJ Hecht's RFC determination (see generally Mayor Br.), the

Court proceeds to the next step of the analysis.

### E. Mayor Did Not Have The Ability To Perform Her Past Relevant Work

The fourth step of the five-step analysis asks whether Mayor had the RFC to perform

her past relevant work.  (See page 20 above.)  ALJ Hecht found that Mayor did not.  (See page 15

above.)  Because neither Mayor nor the Commissioner challenge this determination (see generally

Dkt. No. 13: Mayor Br.; Dkt. No. 15: Comm'r Br.), the Court proceeds to the final step of the five-

step sequential analysis.

### F. There Are Jobs In Substantial Numbers In The Economy That Mayor Can Perform

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[30/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
> Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account
> the claimant's residual functional capacity in conjunction with the claimant's age,
> education and work experience.  Based on these factors, the Grid indicates whether
> the claimant can engage in any other substantial gainful work which exists in the
> national economy.  Generally the result listed in the Grid is dispositive on the issue

---

[30/]    See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of  Soc.
Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d
72, 77 (2d Cir. 1999).

of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x

87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

ALJ Hecht relied on Medical-Vocational Rule 202.18 to find that Mayor is not

disabled.  (See page 15 above.)[31/]  Rule 202.18 directs ALJs to find that a younger, illiterate

individual limited to light work as a result of severe medically determinable impairments is not

disabled.  See 20 C.F.R. Part 404, Subpart P, App. 2, § 202.18.  Mayor, who was forty-two years

old at her alleged onset date (see page 2 above), is classified as a younger individual, see 20 C.F.R.

404.1563(c), and was found by ALJ Hecht to be illiterate (R. 72).  Mayor is limited to the full range

of light work.  (See page 13  above.)  Therefore, ALJ Hecht properly applied Rule 202.18 to find

that Mayor is not disabled.

## CONCLUSION

For the reasons discussed  above, the Commissioner's determination that Mayor was

not disabled within the meaning of the Social Security Act is supported by substantial evidence.  The

Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is GRANTED and Mayor's

---

[31/]    Rule 202.16 also would support ALJ Hecht's conclusion that Mayor is not disabled.

47

motion for judgment on the pleadings (Dkt. No. 12) is <u>DENIED</u>. The Clerk of Court shall close the

case.

        SO ORDERED.

Dated:       New York, New York
               December 17, 2015

_____

**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:     All Counsel